May it please the Court, I would like to reserve five minutes of my time for rebuttal. Miliano Santiago asks this Court to declare illegal the involuntary extension of his enlistment contract with the Army National Guard beyond its specific termination date of June 27, 2004. He also asks that until the Court issues its decision in this case, his deployment to Afghanistan, which is now scheduled two days from now for Friday, be enjoined. In 1996, when Miliano Santiago was 18 years of age and completing his junior year in high school, he enlisted in the Oregon National Guard for a specific term of eight years. He did everything required of him during those eight years, was promoted to sergeant, received fine evaluations. There is no question that under the terms of his contract, which is in turn consistent with the statute authorizing it, 10 U.S.C. 12302, Santiago could have been called to active duty at any time during those eight years. But there is nothing in the operative section of his contract which applies to national emergencies declared by the President, which allows his contract to be extended whether or not he is called to active duty. Mr. Goldberg, assuming that the common law of contracts applies to military enlistment contracts, and assuming that we have the authority to address the issue, why is it not sufficient under your theory of the case that Santiago's enlistment contract states clearly at various points that it is only a partial statement of applicable law and that it is always subject to change without notice by act of Congress or declaration of the President? When one reads the contract, in fact, there is only one provision in the contract, and it's directed at ER2 and it's section 9B, which does say that laws and regulations that govern military personnel may change. So we acknowledge that if a law was subsequently passed, it could have changed the provisions of the contract. However, Judge, that is not our case. In this case, the statute which the government is relying on, 12305, had been in existence for almost 15 years before Santiago signed his contract. And there is no mention of that provision in the contract, even though the contract cites every other statutory provision in the text of the contract, which applies or which allows the military to extend military enlistment. Counsel, what about paragraph 11 that says the enlistee may at any time be ordered to active duty involuntarily under any conditions authorized by law, and, in fact, at the time of his enlistment or which may hereafter be enacted into law? What do you make of that language? I'm sorry. Is the Court referring to paragraph 11 on ER10 or paragraph 11 on ER15? Yes. That's an addendum to the contract, the statement of understanding of reserve obligations and responsibilities. And, again, it talks about conditions which were in existence at the time of his enlistment. The condition at the time of his enlistment was not there was no national emergency declared by the President during that time. We have no dispute, again, that he could have been ordered to active duty at any time during his contract. We do not dispute that fact. The issue, though, in this case is that if Santiago, for example, had been ordered to active duty a year before June 27, 2004, in June of 2003, that once June 27, 2004 came along, that date, he would have to have been discharged because there was nothing in the contract which specifically addressed the extension of this enlistment contract in this situation in this case. Mr. Goldberg, you concede, do you not, that the President did, in fact, declare a national emergency in the days following September 11, 2004? Absolutely. And that that declaration of national emergency was apparently repeatedly extended annually thereafter. There's no dispute about that. No dispute. All right. If that is the case, then doesn't this really turn on whether or not Sergeant Santiago was ordered to active duty as opposed to having his unit placed on an alert for possible mobilization? I think that does become an important factor in this case. But if you first look at our first argument, which is the contract argument, again, we have no dispute that he could have been ordered to active duty. He was not. Then the question becomes, well, if he had been, if you accept the government's position, well, an alert is the same as an order to active duty, then essentially he was ordered to active duty before June 27, 2004. However, the statute, 12305, is clear in its use of the phrase active duty. Active duty, help me with the statutory language. 12305A says, notwithstanding any other provision of law, during any period members of a reserve component are serving on active duty pursuant to an order to active duty under authority of Sections 12301, 2, 3, and 4, the President may suspend any provision of law relating to separation applicable to any member of the armed forces who the President determines is essential to the national security of the United States. Why doesn't that mean on its face that once the President declares a national emergency and once he or his delegee, the Secretary of Defense or Secretary of the Army, orders any reserve component anywhere in the country to active duty and alerts other reserve components that they are now mobilized, that that statute is triggered and, in essence, all leaves and enlistment terminations are canceled until further order? That, of course, is the government's interpretation of this contract. And we will concede to the court. I'm talking about the statute now. We're talking about 12305. I'm sorry. I misspoke. Of the statute. And I concede that that could be a reasonable interpretation of the contract. Our reading of the contract, however, is to say that the President does have the right to extend separate to postpone separations of contracts, but only, and now we refer to that first clause, during and the plain meaning of the statute, during any period members of a reserve component are serving on active duty. So our reading of the statute is that if at the time he would stop loss, which would have been in June 27, 2004, he was not, using the words of the statute, serving on active duty, it was too late at that point for the government to apply stop loss to him. Well, he wasn't, but you do concede that prior to June 27, 2004, there had been reserve components around the country who had been ordered to active duty. I concede that. It's irrelevant in terms of my reading or Santiago's reading of the statute, although it's consistent with the government's reading of the statute. Well, let me ask a more practical question. How many reservists are potentially subject to this argument? My understanding is it could be in the thousands. In fact, there was no evidence in the trial court to answer that question. The government has asserted in its brief, and I know it asserted in an argument before the trial court, that this could affect thousands of other people. The class we'd be talking about would be people whose enlistment expired between the time their unit was alerted and the time it was called active duty. Correct. Specifically, it's the people whose contracts ended before their unit had been ordered to act. Let me ask you the practical concern that I have if we rule in your favor. Yes. And it is simply this. Who mans the watch when the president declares a national emergency based upon terrorist attacks and the country is in the process of mobilizing to meet that threat and the president has designated the reservists as essential to national security? Isn't the intent behind the statute to make sure that we have sufficiently ready forces that can be mobilized to meet the threat in order to do whatever it's going to take Congress and the president to do to mobilize the rest of the nation to backfill? And the response to that is that Congress has instituted a series of actions that the president can take in this situation and that Congress can take in this situation. Congress, of course, is free to declare war in the situation which would implicate other provisions of the contract and allow extensions of contracts. But in this situation, when you're dealing with a presidential national emergency, number one, the president can order troops to active duty, reservists to active duty, and there's certainly no evidence in the record that every reserve unit had been ordered to active duty. Second of all, the president can extend enlistments, but the president's authority in this regard is predicated on the authority which Congress has given him. Well, and his authority as commander-in-chief to protect and defend the country from attack. Absolutely, but that authority of the president is not unencumbered in the Constitution. And in fact, the scheme that's been set up in this case is that Congress in 12305 gave the president the authority to do certain things. In 12302, it is Congress which gave the president the authority to order reservists to active duty. In 12305, Congress gave the president the extraordinary authority of extending people's enlistments contract, but only, it's our position again, in certain situations. And the specific situation we're talking about is during the period where the unit has been ordered to active duty. But aren't you really asking the third branch of government, we as judges are going to somehow second guess the president's determination as the commander-in-chief that he needs Sergeant Santiago and others who are trained and ready to go at a time when it may take a significant period of time for the country to complete the logistics that are necessary in order to move the country from peacetime to a war footing, if that's what's going on. And my response to that is no. We are really asking, we are not again challenging the declaration of national emergency. And in fact, in the trial court, we had raised the question of whether the national emergency still existed as regards to Afghanistan, and we withdrew that argument on appeal because we believed it did in fact move the court into the political realm. What we're asking the court to do in this case is really something which we've been trained to do as lawyers from the first year of law school. Number one, interpret a contract. And there is no basis, there are no cases which the government has cited which says that the provisions of this contract should be looked at differently just because it's a military contract. Secondly, we're asking the court not to second guess whether there's a national emergency declared by the president, but we are asking the court to look at the authority given to the president by Congress in 12305 and to determine whether, in fact, the president and the executive branch has exceeded that authority. We sent the court- But in order to do that, you really are asking us to make some sort of a reasonableness determination once the president issues the executive order declaring the national emergency to somehow second guess his determination that in this particular instance, Sergeant Santiago, by virtue of the terms of his contract, is simply not amenable to call up when the president is saying, I need him. We are asking the court to do that, though. We are not asking the court to second guess anything the president has done. We are asking the court to scrutinize the president's actions based upon the contract that was entered into, based upon his clear statutory authority, and based upon the constitutional issue that we raised. You know, at one point, we submitted a 28-J supplemental authority to the court, citing the Cherokee Nation case, which had been decided by the U.S. Supreme Court just last month. And though that case is not on all fours regarding this case, there's a very important principle in that case. Number one, the Supreme Court said that government promises, government contracts, should be upheld as other contracts. But on this issue, what the court said is that if you could look at a statute and you can interpret it in two different ways, and we concede, as Judge Thomas pointed out, that the government interprets 12305 one way. We believe our interpretation is equally reasonable in light of the legislative history and in light of the language of the statute. If you have two different reasonable interpretations, but if one results in nullification of the government's promises or contracts, and the other interpretation allows you to uphold the government's promises and contract, then what the Supreme Court admonished us to do, I believe, is to accept the interpretation which allows us to uphold the contract. Our interpretation of 12305 allows you to uphold this contract that was entered into between this 18-year-old kid and the United States government. But the contract was subject to any subsequent statutes. So where does that leave us in terms of upholding the contract? 12305, if 12305 had been enacted subsequently, I'd have a problem. But that's the point. I think the judges pointed out exactly, or you pointed out exactly the point. 12305 was in existence 15 years before this contract was signed. It was not a subsequently enacted contract. And the contract included every other provision, every other statutory provision, which allowed contracts to be extended except that one. And it's our position, and we talked about the excrecio unius maxim of construction, which the court has recognized just a couple years ago in the Morales-Escuero case. The fact that the government could have included that provision in the contract and didn't, we believe, is indication of the government's intent. The government knew about 12305. All it needed to do was add another paragraph to this contract. Santiago, who was 18 years of age, didn't know about 12305. And if the government intended at some later point to apply it to him, then they should have included it in the contract. But that reads out the provision in the contract that says that the law could subsequently change. I mean, there wouldn't be any way that the government might anticipate, and therefore it couldn't list all of the potential circumstances in the future that might change the terms of his enlistment. Again, I agree with the Court. If there had been a change in the law, if 12305 was enacted subsequent to the contract, we would certainly not have the same argument. But the operative fact is that it was existent there. Alito How does your reading of the statute address the government's argument that there's a substantial need to maintain unit cohesion to ensure that soldiers who have trained and worked together are employed together to ensure maximum efficiency as a military fighting unit? Well, I think in answering that, it's important to remember that the government can see that if the alert to Santiago's unit had been sent after June 27th, he would have been allowed to leave the military. So obviously, you know, the government does throw out these terms, unit cohesion, and the idea of deferring to the military. But I think we do have to scrutinize those terms. And there obviously would have been an effect on unit cohesion. So do we question the Commander-in-Chief's declaration, if that's what it was, through the Department of Defense that this is important to unit cohesion? I don't doubt that the idea of unit cohesion is important. But again, Congress has set limits in the President doing this on how that can be applied. But I think it's not unrealistic, and I certainly don't mean to be disrespectful to say, that you have to scrutinize some of this stuff. We have submitted declarations to show, for example, that there were several people in the unit that were stationed in Pendleton, Oregon, who were not deployed to Afghanistan because of other reasons. There were medical reasons. Some became pregnant. Some, in the meantime, have been convicted of crimes. Well, that affected unit cohesion. Not everyone went over. Nonetheless, there are other factors which come into play in that regard. But the Congress provides for that, does it not? I mean, there's an exception, for example, if his employer has certified that his civilian duties were more important to national security. There's a provision to get an exemption under that part of the contract. I spent time trying to figure out how to address unit cohesion arguments, and I don't think the issue is so much unit cohesion as much as needing more people in the military to perform these tasks at a time when recruitment is difficult and people are not reenlisting as they have in the past. And the military can deal with this in many other ways. They can reduce troop levels. They can order more reservists to active duty. They can even institute, or Congress can institute, a draft. But to deal with the situation by ignoring a service member's contract statutory and constitutional rights, that is something, even with unit cohesion floating around, which should not be tolerated by this court. What constitutional right is being ignored? It's our position that he has his due process rights under the Fifth Amendment are being ignored in two ways. We've tried to spell this out in this contract. One, if you do not buy our contractor statutory arguments, the fact that he wasn't given notice by the government at the time that his contract as enlistment could be extended in this situation, in the case of a presidentially declared national emergency, results in him not having been given the kind of meaningful notice that we believe the Due Process Clause requires if you're going to deprive someone of his liberty, of his freedom. But isn't that the whole purpose of the provision that Judge Rawlinson read to you? To warn him that subsequent events may affect the terms and conditions of his enlistment. Again, as I interpret the contract at least, what it provides is that we can change the law to deal with those subsequent events. But again, that's not what happened in this case. Or the law that's in effect at the time. It not only talked about subsequent law, but law that was in effect at the time of the enlistment. But Judge, and this is where I think the due process argument, to some extent, overlays the contract and statutory arguments. We have to think about what the Constitution is saying in terms of meaningful notice and fairness here. We have an 18-year-old kid. We have the U.S. government. He's signing a contract. Every provision, every eventuality for his contract being extended, as well as him being ordered to active duty, is listed in that contract except one. Except one. To expect that an 18-year-old kid is going to read this contract and say, oh, I better go out and read the United States Code to see if there's another provision that might apply to me, I think is really unreasonable when the government has included every other provision in the contract. And when, again, all they had to do was add one more paragraph to put him on notice. Now, you can ask. I think we have your argument in mind. Your time has expired. Let's hear from the United States. Thank you. Thank you, Mr. Goldberg. Mr. Byron. May it please the Court, I'm Thomas Byron from the Department of Justice here on behalf of the respondents and appellees in this case. The United States is engaged in ongoing military operations around the world, including in Afghanistan and Iraq. And the military depends to meet the challenges posed by those operations on the volunteer armed forces, including the Ready Reserve. I want to emphasize at the outset that the United States government is deeply grateful for the dedicated service of all personnel, active and reserve, who preserve and protect our nation's security. But I also want to emphasize that Sergeant Santiago's unit is now in Afghanistan making final preparations for operations that they are undertaking there and that Captain Duran, the commander of that unit, has affirmatively emphasized in the record of this case that Sergeant Santiago is critical to those operations. Of course, that might be true, even if the stop-loss order had come a day after he was separated. I think that's right, Judge Canby, but the military's policy is what's at issue here, the stop-loss policy that's embodied in the military personnel message in the record. And that policy makes clear that units that are alerted or mobilized, ordered to active duty, in other words, are subject to unit stop-loss. Well, that's certainly what the order says, and the question is whether that's authorized. That's right, Judge Canby, and the question, then, is a statutory one, I think. As in any case of a policy of the United States government or one of its agencies, the question becomes, does a statute authorize or the Constitution authorize the policy that has been adopted? And here, Section 12305A, by its terms, does give the military,  the clear statutory power to suspend provisions of law relating to separation, retirement, et cetera. Counsel, what's your response to opposing counsel's argument that if there is one interpretation that preserves the contractual rights as opposed to one that does not, that we should adopt the interpretation that preserves the contractual rights? What's your response? Judge Rawlinson, I think he invoked for that principle a recent case by the Supreme Court in Cherokee Nation. Cherokee Nation, like other cases, I think, that address that kind of maxim, dealt with a plain conflict between a contract and a statute. To be sure, those are difficult cases, but this is not such a case because there is no conflict between the terms of the contract, if it is a contract, it's never called one, it's called an enlistment or re-enlistment document, between the terms of that document and any statute. Indeed, the document takes great pains, as I think the Court's questions recognize, to preserve the principle that federal law and statutes and regulations apply, and they are not superseded by this agreement that he signed. And nothing in that document purports to waive the applicability of any otherwise governing statute. Of course, it does say that the law applies as to conditions of service, and several other things. It never does say length. I'm not sure what to make of that, though, Judge Canby. After all, it nowhere says that it guarantees a release date either. It says that it's for a term of eight years, to be sure, but it doesn't say that he's promised he will be released on any certain date. That actually implicates an example, I think, that opposing counsel omitted to mention, and that's in Section 1168 of Title X, which states that separation is not complete, discharge is not effective until the soldier receives a discharge certificate or certificate of release. There's paperwork to be done, in other words. That has actual meaning in a category of cases this Court may or may not be familiar with. They typically don't arise in the district court or go to the Court of Appeals, but there are cases involving soldiers who are under court-martial proceedings at the time they would otherwise be eligible for separation from the military. And the courts have been clear, and the military's policy is equally clear, that the separation is not automatic, and that if a soldier is in court-martial proceedings, the soldier remains in active service until those proceedings are complete. That's not the situation here. Of course not, Judge Rawlinson. My point is merely that there are circumstances in which an anticipated release date comes and goes without a soldier actually leaving service, and that it's not true that the enlistment document sets out every circumstance. I think there are others as well. Title X is lengthy and complex, and while no one is expected at the time of enlistment to understand everything in that statute, it's true that the document one signs, that Sergeant Santiago here did sign, emphasizes to the enlistee that there are a wide and broad body of regulations and statutes that will govern your service as a military member. Counsel, do you take issue with the idea that this was a contract? I don't think it's necessary for this court to decide that question. There's certainly language in a number of older cases in which, and some more recent, actually, in which the courts have said they will apply principles of contract interpretation to understand what the enlistment document means. If that's true, Mr. Byron, why is it not unconscionable that an enlistment contract not clearly state that the term of enlistment can be extended indefinitely in time of war or national emergency? Mr. Goldberg argues that most of the people signing these agreements are young and relatively unsophisticated in contract law. Well, Judge Talman, there are, after all, plenty of things that are in Title X that are not set forth. I think it's not a choice. I'll accept your argument that ignorance of the law is no excuse, but the question is if contract principles apply, why can't we simply declare it's unconscionable not to include, as Mr. Goldberg has argued, a very simple statement in paragraph 11? It would just involve a simple rewording of the language. The reason is that although those cases that I referred to rely to some extent on contract principles, as I was about to say, none of them has ever held that interpreting that document as a contract allows an enlistee to avoid an otherwise applicable federal law. That's the fundamental reason. And it's true in other areas of contract as well. A contract is not interpreted in a vacuum, after all. The applicable federal law presumably is 1205. That's right, Judge Kennedy. Now, that says during any period members of a reserve component are serving on active duty, the President can extend basically any member of the armed forces. Does it make any sense to read that as applicable to other than those who are on active duty? I think it only makes sense to read it that way, Judge Kennedy, and here's why. As we explained in our brief, the statute's reference to members of a reserve component serving on active duty is limited to establishing a temporal limitation. In other words, the period during which the President may suspend those provisions of law relating to separation and retirement, etc. Well, the problem that gets to it, under 12301, individual members of the reserve can be called to active duty for medical treatment. Only with their consent, Judge Kennedy. With their consent. So let's say two of them are recalled to active duty with their consent. Yes. So that means that it's a period when members of a reserve component are serving on active duty. That would mean then the President can extend every reservist's enlistment until 2031, as long as the President's willing to say they're needed for national security. Is that the implication of your interpretation? It may be, Judge Kennedy, but I don't think it's obviously so. And it's certainly not the way the statute has been interpreted by the President or the Defense Department. The only references in Congress, of course, were that, well, this gives the President the power to extend people on active duty. And I can understand why, when you call a unit to active duty, you don't want to get someplace and have people dribbling away. You want the full two years of commitment. That's right, and that explains the policy. When the enlistment contract is up and somebody is able to leave. Well, that explains the policy concern, which after all is also reflected in the legislative history in the Senate report, which says the effectiveness of the President's call of authority in times of crisis would be diminished or weakened by the normal separation of retirement of regular and active personnel. But that doesn't explain in any way, it doesn't refer in any way to that preliminary temporal predicate in the statute, which says only that this is the time when the President can invoke these authorities. And I think, Judge Kennedy, if you're concerned, for example, about an extreme interpretation, which neither the President nor the military has adopted, that would suggest, for example, that a military, I'm sorry, that a medical mobilization might be sufficient. It seems that construing in perimeteria sections 12301, 12302, and 12304, the thing they have in common is the activation of the reserves in a time of crisis. And that certainly that's consistent with the interpretation that's been given to the President's section 12305 authority here. That this is a time that the President has declared to be a national emergency by reason of terrorist attacks on September 11th and the continuing and immediate threat of further attacks on the United States. That was the basis for invoking section 12302 in 19, I'm sorry, in 2001. That's the basis for invoking section 12305 in the military personnel message. Counsel, what's your response to opposing counsel's argument that there has been a constitutional violation for failure to give notice of the possible extension of the release date? Judge Rawlinson, nothing in the Constitution and certainly nothing in any case law that my opponent has cited suggests that the government is under an obligation to deliver the kind of very specific notice that would be required to satisfy that argument. There is no obligation on the part of the government generally or the military specifically to deliver that kind of notice some many years ahead of time before it's even invoked. And I would emphasize as well that there's ample notice, as we explained in our brief, in the enlistment document that the period of enlistment might be extended. Now, there's nothing in the Constitution that says the government has to deliver very specific instances of every kind of circumstance in which that extension might occur. I would emphasize as well, as I think Judge Rawlinson, one of your questions recognized, that the provision in the enlistment document that says the governing law might change does not limit itself to statutes. It says statutes and regulations. And it specifically says statutes and regulations relating to personnel. And there has been a change in the relevant governing law because the stop loss policy was adopted in the unit stop loss policy, the one that's at issue here, was adopted in November 2002. It's a personnel regulation that has changed. And in that respect, there was ample notice in the enlistment document that this could happen. What's your response to opposing counsel's observation that 12305 was conveniently omitted from the list of statutes that were included or incorporated? Well, as I've explained, I think there are lots of provisions in Title X. It is, after all, a very large title of the United States Code that are not included in that document. He seized upon the one he complains of in this case. But I don't think that's representative of the many statutory provisions that are not specifically referenced. And after all, the argument he makes from the canon expressio unius is a means of interpreting an ambiguous contractor statute or other document. It is not one, after all, that establishes a clear conflict by its terms between the enlistment document and the governing statute. After all, the case is talking about expressio unius, which is a common law canon. Emphasize that it is a means of implying meaning where there is none expressed. That's not a basis for avoiding in this circumstance the governing statute in which Congress gave the president the power in times of crisis, when there's a national emergency, to mobilize the armed forces of the United States and to ensure that those units that have trained together and are prepared to work together to ensure our national security will undertake their missions by staying together. That's the fundamental policy underlying this statute, and its meaning is not subject to question. My opponent has not offered any basis for understanding the actual language in Section 12305. Judge Canby, I think, archaically a few moments ago, investigated that question, whether there's a basis in the terms of the statute, its language and structure, for understanding the reference to active duty as in any way modifying the very broad reference to the president's power to suspend provisions of law that would otherwise apply to any member of the military. So your position is that once the president activates a reserve component anywhere in the country and issues a mobilization alert, that's sufficient to trigger this particular paragraph in Sergeant Santiago's enlistment agreement? It is because the statute gives the president that broad authority, and the military has implemented the unit stop-loss policy in terms that my opponent does not dispute govern this case. Yes. Counsel, what effect, if any, in your view, does opposing counsel's concession that the government's interpretation of 12305 is reasonable? What effect does that have in your view? Judge Rawson, I appreciate your raising that. I think it's very significant. After all, it is a normal principle of statutory interpretation when a federal regulation or other binding legal policy is challenged as contrary to law, that the courts will ask, if there's any ambiguity in the statute at all, and I frankly don't think there is, but even if there were, whether the government's interpretation of that statute is a reasonable one, whether it is permissible. And the fact that it is permissible, I think, is indisputable, as my opponent's concession explains. There's no dispute here that the statute can be understood to mean what the government, the president, and the army have interpreted it to mean, and that should be dispositive. If the court has no further questions, we'd urge the court both to affirm the judgment below and to deny the motion for an injunction pending decision in this case. Thank you. Thank you very much, Mr. Byron. Mr. Goldberg, I'll give you a couple minutes since Mr. Byron finished early. Thank you. Hopefully I won't take very long. To address the last point that you made, Judge Rawson, the fact that there is an alternative interpretation that the government puts forward, and we have a different interpretation of the contract, the question, I think, perhaps, is what do we do? We've argued in our brief the issue of the Chevron case, and we don't believe that deferral or deference to the government's interpretation is required in this particular case. In fact... Even if not required, is it something that's permissible? Not based upon Cherokee Nation. And I think that the rules of trying to interpret all of this change to some extent when the Supreme Court says that you do have to look at it in the context of a contract. And I wanted to say that there are various points where the government and I agree, and there are points where we disagree. This is a contract. And going back to the initial stages of law school, there was consideration on both sides. It talks in terms of promises that both sides are making. This document is a contract. And if you accept our interpretation of 12305, then you're upholding this contract. And the ramifications of that, I think, are significant. Because, again, what we're trying to do is we're trying to deal with national emergencies. We're also trying to make sure that young men and women enlist in the military service. If you accept what the government, what Mr. Byron suggested, which is that somehow there is no ending point, or this contract could be read in such a way that there is no ending point, what young man or woman is going to be willing to sign up, whether willing to commit for a specific term, as Sergeant Santiago was willing to do, to give aid to the military, where he's told instead, you're going to have to give it all to the military at this point. It will adversely affect recruitment. Mr. Goldberg, isn't that the problem for the executive branch and for Congress? I mean, that's certainly a valid consideration and a risk here that it will have an adverse impact on military recruiting. But how can we seize upon that fact in order to resolve the issue of military recruitment? We're not legislators. You're making an argument that might very well receive favorable consideration on the ears of Congress. I'm trying not to make that argument. What I'm trying to say in this case is that the military and Congress, through these statutes, have set up a scheme which allowed the military to enter into a contract with men and women for specific terms, which defines the period of time when they can be ordered to active duty. And that's what paragraph 11, which you referred to, is really saying to this young man. You may be ordered to active duty in certain situations, and we don't dispute that. But the next step, which is not only are you enlisting for eight years, not only can you be ordered to active duty, but you know what? We can extend that eight-year period of time, perhaps indefinitely. Do you lose applicability of Cherokee Nation to this case? No, because... No, because our first argument is a contract argument. And Cherokee Nation, although Cherokee Nation does say that governmental promises and government contracts should be upheld, it's simply following a long line of cases that the government, I guess, is choosing to ignore here, that government contracts are contracts and should be upheld. So to agree with us on that basis, we don't have to go to the statutory interpretation argument. Your position makes it seem as if your statutory argument is really dependent on the success of your contract argument. No. I look at both... Because you're saying, well, there are two reasonable ways to read the statute, and you shouldn't read it the government's way, because the contract will be frustrated. And the government's answer to that is, well, the contract doesn't promise what you think it promises. No. And if I... I apologize if I've confused the Court on that. Our argument on the contract is that Congress intended, or the military intended, not to include the provision in the contract which would allow the extension of the contract. And that's the expressio unius argument. Thank you very much. Counsel on both sides of the case just argued has submitted excellent arguments on both sides, and we thank you. We will take a five-minute recess and then come back to hear argument in the next one. Yes.  Thank you.  Thank you. Thank you. Thank you.
judges: Canby, Tallman, Rawlinson